**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

PAMELA E.,[1]

                              Plaintiff,

     vs.

ANDREW SAUL,[2]
Commissioner of Social Security,

                          Defendant.

Case No. 4:19-cv-00004-SLG

## DECISION AND ORDER

On or about November 29, 2012, Pamela E. ("Ms. E.") filed an application for

Supplemental Security Income under Title XVI ("SSI") of the Social Security Act ("the

Act"), alleging disability beginning May 30, 2011.[3]  Ms. E. has exhausted her

administrative remedies and filed a Complaint seeking relief from this Court.[4]  On July 17,

2019, Ms. E. filed an opening brief.[5]  The Commissioner filed an Answer and a brief in

---

[1] The Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[3] Administrative Record ("A.R.") 15.  The application summary lists December 14, 2012 as the application date.  A.R. 386.  Ms. E., through her representative, amended the alleged onset date to November 29, 2012, her application date.  A.R. 15, 40.

[4] Docket 1 (Compl.).  Ms. E. obtained counsel and amended her Complaint.  Dockets 4, 5, 8.

[5] Docket 15 (Pamela E.'s Opening Br.).

opposition to Ms. E.'s opening brief.[6]  Ms. E. filed a one-page reply brief.[7]  Oral argument was not requested and was not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below, Ms. E.'s request for relief will be granted.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to

---

[6] Docket 13 (Answer); Docket 17 (Def.'s Br.).

[7] Docket 18 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing

court may only consider the reasons provided by the ALJ in the disability determination

and "may not affirm the ALJ on a ground upon which he did not rely."[14]  An ALJ's decision

will not be reversed if it is based on "harmless error," meaning that the error "is

inconsequential to the ultimate nondisability determination . . . or that, despite the legal

error, 'the agency's path may reasonably be discerned, even if the agency explains its

decision with less than ideal clarity.'"[15]

## II.  DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have

contributed to the Social Security program and who suffer from a physical or mental

disability.[16]  In addition, SSI may be available to individuals who are age 65 or older, blind,

or disabled, but who do not have insured status under the Act.[17]  Disability is defined in

the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.[18]

---

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] 42 U.S.C. § 423(a).

[17] 42 U.S.C. § 1381a.

[18] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[19]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[20] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[21] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[22] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert ("VE"), *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[23] The steps, and the ALJ's findings in this case, are as follows:

---

[19] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[20] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[21] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[22] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[23] *Tackett*, 180 F.3d at 1101.

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."

*The ALJ found that Ms. E. had not engaged in substantial gainful activity since November 29, 2012, the application date.*[24]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *The ALJ determined that Ms. E.'s substance abuse; depressive disorder; dysthymia; bipolar disorder unspecified; bipolar I disorder; generalized anxiety disorder; post-traumatic stress disorder; recent degenerative disc/joint disease in the lumbar and cervical spines; and status post bunion were severe impairments. He noted that "if [Ms. E.] was abstinent from substances, her mental health impairments of depressive disorder; dysthymia; bipolar disorder; generalized anxiety disorder; and post-traumatic stress disorder (PTSD) would not be severe impairments." The ALJ also determined that Ms. E.'s restless leg syndrome was non-severe and her migraine headaches were not medically determinable.*[25]

**Step 3.** Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is/are the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is

---

[24] A.R. 18.

[25] A.R. 18–19.

conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined that Ms. E. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[26]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[27] *The ALJ concluded that Ms. E. had the RFC to perform medium work with the following limitations: never climbing ladders, ropes, or scaffolds and never having exposure to unprotected heights or hazardous machinery. She was also limited "to work involving only occasional interaction with the general public." The ALJ noted that this limitation was included "due to the effect of substances at times; otherwise, there would be no mental limitations."*[28]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be

---

[26] A.R. 19.

[27] 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4).

[28] A.R. 21.

disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that Ms. E. had no past relevant work.*[29]

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.  *The ALJ found that considering Ms. E.'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Ms. E. could perform, including janitor, cleaner II, and laundry worker.*[30]

Based on the foregoing, the ALJ concluded that Ms. E. was not disabled since November 29, 2012, the date the application was filed.[31]

## III. PROCEDURAL AND FACTUAL BACKGROUND

Ms. E. was born in 1963; she is currently 56 years old.[32]  She reported last working part-time for her landlord as a painter and cleaner, but that work did not constitute substantial gainful activity.[33]  In the past, she also worked as a waitress, at a fabric store, and as a housekeeper.[34]  Ms. E. initiated her application for disability benefits on or about November 29, 2012.[35]  On March 13, 2013, the SSA field office found Ms. E. was not

---

[29] A.R. 26.

[30] A.R. 26–27.

[31] A.R. 27.

[32] A.R. 26, 386.

[33] A.R. 18, 70–73.

[34] A.R. 70–73, 492, 516.

[35] A.R. 15, 386; *supra* note 2.  The application in the record uses December 14, 2012 as the

disabled.[36]  After a hearing on January 12, 2015, the ALJ issued an unfavorable ruling on March 19, 2015.[37]  The Appeals Council remanded the case back to the ALJ on August 4, 2016 on several grounds.[38]  On August 16, 2017, Ms. E. appeared by video with

_____

application filing date.  A.R. 386.

[36] A.R. 138.

[37] A.R. 139–50.

[38] The Appeals Council directed the ALJ to:

- Evaluate and weigh the report from consultative psychological examiner, Nina Wendt, PhD.;

- Comply with post-hearing development procedures according to HALLEX I-2-7-1, 1-2-7-30, and 1-2-7-35;

- As appropriate, the ALJ may request the nontreating source, Dr. Wendt, to provide further clarification of her April 8, 2015 opinion;

- If necessary, obtain additional evidence concerning the claimant's atypical depressive disorder, generalized anxiety disorder with episodes of panic/PTSD, bipolar disorder NOS, alcohol dependence by history, in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence.  The additional evidence may include, if warranted and available, a consultative mental examination with psychological testing and medical source statements about what the claimant can still do despite her impairments;

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (SSR 96-8p).  In so doing, evaluate the treating and nontreating source opinions and nonexamining opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p, 96-5p and 96-6p, and explain the weight given to such opinion evidence.  Further evaluate and weigh other source evidence pursuant to Social Security Ruling 06-3p.  As appropriate, the ALJ may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite her impairments.  The ALJ may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources;

- Further evaluate the claimant's alleged intensity and persistence of her symptoms and provide rationale in accordance with the disability regulations and Social Security Ruling 16-3p (20 C.F.R. 416.929); and

counsel at a hearing before ALJ Paul Hebda.[39]  On December 21, 2017, ALJ Hebda

issued a second unfavorable decision.[40]  The Appeals Council denied Ms. E.'s request

for review on December 21, 2018.[41]  On February 20, 2019, Ms. E. appealed to this Court;

she is represented by counsel in this appeal.[42]

*The Medical Record*

Although the Court's review of the record is primarily focused on the time period

after the application date of November 29, 2012, the Court also considers the following

relevant medical evidence that predates Ms. E.'s application date:

On August 22, 2012, Ms. E. saw Kendel Bormann, PA-C, at Interior Community

Health Center in Fairbanks, Alaska ("ICHC").  She reported "significant weight gain,

insomnia, psychomotor agitation, feelings of worthlessness (guilt), impaired concentration

(indecisiveness), and recurrent thoughts of death."  She also reported that she planned

to go to the Ralph Perdue treatment center for alcoholism.  On physical examination, PA

Bormann observed that Ms. E. was alert, cooperative, anxious, and tearful.[43]

---

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rule 85-15).  Before relying on the vocational expert evidence the ALJ will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).  A.R. 15–16, 156–60.

[39] A.R. 69–81.

[40] A.R. 15–28.

[41] A.R. 1–5.

[42] Docket 1.  *See supra* note 3.

[43] A.R. 822–24.

On August 30, 2012, Ms. E. saw Alisabeth Thurston-Hicks, M.D., at Fairbanks Psychiatric & Neurological Clinic for a psychiatric evaluation. Ms. E. reported a history of panic disorder, depression, and bipolar disorder with a hospitalization in 1995 for a suicide attempt by overdose and hospitalization in the psychiatric unit of Fairbanks Memorial Hospital in 2009. On examination, Dr. Thurston-Hicks noted that Ms. E. was alert, but "a little bit slowed in her speech and mannerisms" with a "somewhat depressed" affect. Ms. E. denied experiences of hallucinations or paranoid delusions. Dr. Thurston-Hicks observed that Ms. E. was able to recall 3/3 items immediately and 2/3 after five minutes, was unable to complete serial sevens, and could spell the word "world" backwards. Dr. Thurston-Hicks opined that Ms. E.'s judgment and insight were fair. She noted "an emerging pattern of continued mood instability with brief but impairing periods of both manic symptoms and depressed symptoms." She also noted that Ms. E. likely had bipolar spectrum mood disorder if Ms. E.'s "report [was] accurate regarding abstinence from alcohol and cocaine for at least a month with continued persistent mood cycling." Dr. Thurston-Hicks also diagnosed Ms. E. with suspected PTSD.[44]

On September 19, 2012, Ms. E. saw Suzette Mailloux, N.D., at Alaska Center for Natural Medicine in Fairbanks, Alaska. She reported recently attempting suicide and that she had been depressed and drinking. She also reported being on a waitlist for alcoholism treatment. On examination, ND Mailloux observed that Ms. E. was in no distress with a normal and appropriate affect.[45]

---

[44] A.R. 584–86.

[45] A.R. 589–91.

The following are the relevant medical records after November 29, 2012:

On June 3, 2013, Ms. E. visited Helmut Kramer, MD, at Fairbanks Community Behavioral Health Center for a psychiatric evaluation. She was living alone at the time. She reported maintaining sobriety since February of 2013, but that she continued to struggle with suicidal thoughts, nightmares and anxiety. She stated she had been prescribed medications such as Zyprexa, Paxil, Seroquel, Prozac, Topamax, and Cymbalta in the past, but reported that none of those medications had been helpful. On examination, Dr. Kramer observed that Ms. E. was alert and cooperative, but "clearly having difficulty with focusing and concentrating." He also noted that she was "clearly very anxious, distraught, and depressed" and "in dire need for help."[46]

On January 31, 2014, Ms. E. went to the emergency department at Fairbanks Memorial Hospital for acute anxiety and a refill of her prescriptions for clonazepam and Depakote.[47] She reported that she had been out of her medications for approximately three days. She reported that she was a "little bit more anxious" and her sleep pattern was "a little bit off." On examination, the attending physician observed that Ms. E. was alert and oriented; her speech was clear; she answered questions appropriately; made good eye contact; and was well-groomed.[48]

_____

[46] A.R. 645–47.

[47] Clonazepam is used to treat seizures and panic attacks. *See* https://www.webmd.com/drugs/2/drug-14403-6006/clonazepam-oral/clonazepam-oral/details. Depakote is used to treat seizure disorders, bipolar disorder, and prevent migraine headaches. *See* https://www.webmd.com/drugs/2/drug-1788/depakote-oral/details.

[48] A.R. 781–83.

On May 28, 2014, Ms. E. initiated care with Jean Boga, ANP, at Fairbanks Community Mental Health Services via TeleBehavioral MED. Ms. E. reported taking her medications as prescribed. She reported hearing voices a couple of times of week. ANP Boga opined that Ms. E.'s medications were marginally effective as she observed that Ms. E. was "still very anxious and appears to be manicky." ANP Boga also observed that Ms. E. was on time and adequately groomed and dressed. She noted that Ms. E. was "somewhat tangential" and had a great deal of difficulty remembering. She opined that the diagnosis of Depressive Disorder, NOS "may not be an accurate diagnosis"; instead ANP Boga "highly suspect[s] that [Ms. E.] is at least hypomanic at this point." ANP Boga increased Ms. E.'s Depakote, changed her Klonopin prescription, and added Prazosin.[49]

On July 5, 2014, Ms. E. saw Kjersti Bowen, MSW, at Fairbanks Community Mental Health Services for a mental health assessment. On examination, MSW Bowen observed that Ms. E. was adequately groomed; cooperative and attentive; with a "groggy" mood and tearful affect; appropriate statements with mood; linear thinking with no obvious delusions or abnormal thoughts; reported auditory and visual hallucinations; oriented to person, place, time, and situation; with normal abstract thinking and normal immediate memory. MSW Bowen reported that Ms. E. did not perform the serial sevens test, but she did complete the serial threes and counting tests. Ms. E. relayed extensive and significant physical and sexual abuse and other traumas during her life. MSW Bowen diagnosed Ms. E. with Bipolar I; chronic PTSD; and alcohol dependence, in early remission. Ms. E. reported being on probation and doing community service. MSW

_____

[49] A.R. 658–59.

Bowen opined that Ms. E. had a serious mental illness and was unable to function independently as a worker, student, or homemaker and was unable to "exhibit appropriate social behavior, resulting in intervention by the mental health system or judicial system."[50]

On August 6, 2014, Ms. E. followed up with ANP Boga. She reported that her prescription of Depakote was no longer effective and that she was "up all night" and felt terrible. ANP Boga assessed Ms. E. with Bipolar I Disorder, Type I and PTSD.[51] On the same date, ANP Boga opined that Ms. E. had been disabled since May 2011 and was unable to perform any kind of gainful activity full time in a competitive work environment.[52]

On August 29, 2014, Ms. E. followed up with ANP Boga. She reported recently running out of Latuda. On examination, she was very anxious and irritable; on time for her appointment; and adequately groomed and dressed. ANP Boga also observed that Ms. E. had "some difficulty remembering," but that her memory had improved somewhat. She noted that Ms. E. was better organized, much less irritable, and did not cry at the appointment. ANP Boga opined that although Ms. E.'s mental status was improving, she still considered Ms. E. disabled.[53]

On September 18, 2014, Ms. E. visited ANP Boga. She reported that she was not drinking. She also reported stopping Latuda due to a dystonic reaction and continuing to have racing thoughts, anxiety, and irritability. ANP Boga noted that Ms. E. "was much

---

[50] A.R. 660–673.

[51] A.R. 656–57.

[52] A.R. 643.

[53] A.R. 654–55.

calmer" and "less irritable" than the previous visit, but had memory and tracking difficulties and continued to be anxious, although her anxiety was improving. ANP Boga opined that "[w]hile [Ms. E.'s] mental status [was] improving, she remain[ed] very manicky." ANP Boga prescribed Depakote, Prazosin, Klonopin, and a decreased dosage of Latuda.[54]

On October 17, 2014, Ms. E. saw ANP Boga. She reported that she stopped taking her Latuda prescription due to side effects. On examination, ANP Boga observed that Ms. E. was adequately groomed and dressed. ANP Boga noted that Ms. E. "remains very anxious, but not as anxious as in the past and was less irritable and less tearful. She also noted that Ms. E. continued to have memory problems; pressured speech, although less so; tangential thoughts, but better organized; and improved judgment and insight. ANP Boga discontinued Latuda, but continued Ms. E.'s other prescriptions. She noted that Ms. E.'s mental status was improving, but that she should still be considered disabled.[55]

On December 18, 2014, Ms. E. followed up with ANP Boga. She reported feeling depressed, having nightmares, and being afraid to go to sleep. On examination, ANP Boga observed that Ms. E. was on time and adequately groomed and dressed. She noted that Ms. E. was cooperative with the interview and her speech was normal. ANP Boga noted that Ms. E.'s mood was "anxious and somewhat depressed" and that she was crying, although not sobbing, during the interview. She noted that Ms. E. was experiencing racing thoughts and was tangential and although she was not experiencing

---

[54] A.R. 652–53.

[55] A.R. 1040–41.

auditory hallucinations at the interview, Ms. E. reported that she frequently heard people talking. ANP Boga also noted that memory was still a problem; Ms. E.'s impulsivity was within normal limits and her judgment had improved to good, but her insight was marginal. ANP Boga began Remeron for depression and anxiety and to help with sleep. She continued Ms. E.'s Depakote, Prazosin, and Klonopin.[56]

On January 23, 2015, Ms. E. followed up with ANP Boga. She reported "doing much better for the most part, but for about four days I could not sleep." Ms. E. also reported that her anxiety, irritability, and nightmares had all decreased. On examination, ANP Boga observed that Ms. E. was on time, adequately groomed and dressed for the weather, and was better organized, with much less pressured speech and no crying at the appointment. ANP Boga noted that Ms. E.'s judgment and insight had improved. She increased Ms. E.'s Remeron prescription at the appointment.[57]

On February 26, 2015, Ms. E. saw ANP Boga. She reported "doing better," but that her Remeron prescription was too much and she was feeling groggy during the day. On examination, ANP Boga observed that Ms. E. continued to have problems with memory and anxiety, but that both were improving. ANP Boga decreased Ms. E.'s Remeron prescription.[58] On the same date, ANP Boga checked certain boxes on an attorney-drafted drug and alcohol statement. She indicated that Ms. E. was totally disabled without consideration of any past or present drug and/or alcohol use. She also

---

[56] A.R. 1051–53.

[57] A.R. 1039.

[58] A.R. 1037–38.

indicated that drug and/or alcohol use was not a material cause of Ms. E.'s disability because "my patient is currently not using drugs and/or alcohol and remains disabled."[59]

On March 18, 2015, Ms. E. followed up with ANP Boga. She reported "feeling so much better." On examination, ANP Boga observed that Ms. E. was on time; adequately groomed and dressed for the weather; bright and cheerful; pleasant and cooperative with organized and goal-oriented thoughts; in an euthymic mood; and had normal speech. She noted that Ms. E.'s judgment and insight had also improved.[60]

On March 23, 2015, Ms. E. saw Nina Wendt, Ph.D., at Foundations, LLC, for a mental status examination ordered by Disability Determination Services "to assist in determining if [Ms. E. was] able to reason or make occupational, personal, or social adjustments, to evaluate whether she [was] capable of handling her finances in her own best interest, and to evaluate her ability to do work-related activities." Dr. Wendt reported conducting an interview for one and one-half hours and reviewing records for one-eighth of an hour. Dr. Wendt noted that "[t]here were no documents available concerning [Ms. E.'s] past hospitalizations or her current mental health treatment. Viewing some of these documents would have aided in being able to give [Ms. E.] a more accurate diagnosis." Dr. Wendt also noted that Ms. E. reported hospitalizations in Fairbanks in 2004 and 2012 for suicidal ideation, but Dr. Wendt stated, "[t]here were no records available to determine her state of mind or diagnoses during those hospitalizations." During the interview, Ms. E. reported having a DUI in 2010 and completing treatment at the Ralph Perdue Center

---

[59] A.R. 674–75.

[60] A.R. 1035–36.

in 2012 or 2013.  She also reported having two felony drug charges and being addicted to crack cocaine in the past, but she also reported that she had not used that substance for more than five years.  Ms. E. reported that her medications helped her sleep and that she was able to clean her house and cook, but that she did not leave her house very often because of anxiety.  She reported moving her furniture frequently and painting her walls every two weeks, "because she enjoy[ed] painting and it help[ed] her keep focused."  Ms. E. also reported that she had not handled money for many years, but she thought she would have difficulty doing so due to concentration problems "to the point that she cannot count change."  On examination, Dr. Wendt observed that Ms. E. was oriented to person, place, and time.  Dr. Wendt noted that Ms. E. had problems with her recent, immediate, and remote memories, but that her memory was sufficient to answer questions and follow the line of discussion.  Specifically, Dr. Wendt noted that Ms. E. had "concentration problems as demonstrated by insufficiencies in counting backwards from 100 by sevens, performing serial threes, and counting backwards from 100."  Dr. Wendt also noted that there were "no noticeable signs of psychotic thought process or content," but that Ms. E. was "hypervigilant and [had] an exaggerated startle response, problems with concentration, and sleep problems."  Dr. Wendt noted that Ms. E.'s descriptions suggested manic episodes with psychosis, but that Ms. E. "did not have manic symptoms at the time of the evaluation."  She also observed that Ms. E.'s "mannerisms and affect seemed to indicate" that Ms. E. was depressed at the time of the evaluation.  Dr. Wendt noted that Ms. E. also "has severe PTSD symptoms that cause nightmares, intrusive thoughts, avoidance symptoms, negative alterations in cognitions and mood, and arousal and hyperactivity symptoms."  In summary, Dr. Wendt opined that Ms. E. was a

"chronically homeless and mentally ill woman who [had] not previously had the emotional and physical resources to adequately access services," was unable to "reason or make occupational, personal, or social adjustments," and was unable to handle her own finances. She opined that Ms. E.'s "medication regimen seems to be helping her PTSD, depression, and psychotic symptoms."[61] Dr. Wendt also completed a medical source statement in which she opined that Ms. E.'s ability to carry out simple instructions; to make judgments on simple work-related decisions; interact appropriately with supervisors and co-workers; and respond appropriately to usual work situations and changes in a routine work setting were all markedly impaired due to Ms. E.'s PTSD and bipolar symptoms.[62]

On April 17, 2015, Ms. E. followed up with ANP Boga. She reported being denied social security disability benefits. On examination, ANP Boga noted that Ms. E. was very distraught at the appointment, cried at the appointment, and that she was "certainly at-risk for decompensation." But, she also noted that Ms. E. planned to care for her 1-year old grandson for two weeks, and Ms. E. was "very excited" about that. ANP Boga made no changes to Ms. E.'s prescriptions.[63]

On May 22, 2015, Ms. E. saw ANP Boga. She reported knee problems. ANP Boga noted that "[w]hile [Ms. E.'s] mental status is improving, she remains at-risk for

---

[61] A.R. 684–88.

[62] A.R. 679–83.

[63] A.R. 1033–34.

decompensation, particularly when her friend leaves" as he "will not be able to support her any longer."[64]

On May 29, 2015, Ms. E. saw Kimberly Sonderland, ANP, at ICHC. She reported knee pain. On examination, ANP Sonderland observed no depression, anxiety, or agitation. She also noted intact judgment and insight.[65]

On June 25, 2015, Ms. E. followed up with ANP Boga. She reported that she was depressed and sleepy. She also reported that she could not find work, she had been denied social security disability benefits and chronic acute medical assistance ("CAMA"), and her friend that had been supporting her was leaving the State. On examination, ANP Boga observed that Ms. E. was "very distressed" and quite tearful. She also noted that Ms. E.'s thoughts were organized and goal-directed, her speech was pressured, and her judgment and insight were adequate. ANP Boga opined that Ms. E. had decompensated. She opined, "I do not believe that [Ms. E.] is capable of working full time to support herself." Although ANP Boga considered Ms. E. to be at little to no risk of self-harm at the time, she opined that Ms. E. would be at risk for self-harm if she was not able to obtain employment or a means of support.[66]

On July 30, 2015, Ms. E. followed up with ANP Boga. She reported having nightmares and being afraid to go to sleep. On examination, ANP Boga observed that Ms. E. was on time and adequately groomed and dressed, but she was "quite distressed,"

---

[64] A.R. 1031–32.

[65] A.R. 808–11.

[66] A.R. 1029–30.

was feeling "hopeless," and was "very anxious." She noted that Ms. E. had pressured speech, tangential thoughts, and poor judgment and insight. ANP Boga also noted that Ms. E. was not taking her medications as prescribed.[67]

On October 26, 2015, Ms. E. saw Ambria Ptacek, PA-C, for bilateral foot pain. On examination, Ms. E. was "in no acute distress," was alert and oriented, and walked with a limp.[68]

On October 29, 2015, Ms. E. followed up with ANP Boga. She reported that she continued to volunteer at a homeless shelter and after starting to take her Prazosin prescription again, her nightmares decreased. ANP Boga noted that Ms. E. remained anxious, but less so. She opined that Ms. E. remained disabled. She made no changes to Ms. E.'s prescriptions.[69]

On December 17, 2015, Ms. E. saw ANP Boga. She reported being worried about an upcoming psychiatrist interview. On examination, ANP Boga observed that Ms. E. was on time and groomed and dressed appropriately. ANP Boga also observed that Ms. E.'s speech was pressured and she was somewhat tangential. She noted that Ms. E. was tearful and had difficulty concentrating, but reported she was sleeping well and displayed good judgment and adequate insight. ANP Boga made no changes to Ms. E.'s prescriptions.[70]

---

[67] A.R. 1027–28.

[68] A.R. 704.

[69] A.R. 1025–26.

[70] A.R. 1023–24.

On January 12, 2016, Ms. E. was interviewed by Azariah Eshkenazi, M.D., assistant professor of psychiatry at Mount Sinai School of Medicine, via telephone for a psychiatric evaluation.  Dr. Eshkenazi noted that he initially conducted an interview via Skype with Ms. E. on January 7, 2016, but during the interview Ms. E. "suddenly became extremely agitated, anxious and irritable" and disconnected, thereby ending the interview. Dr. Eshkenazi noted that he reviewed Ms. E.'s medical records and past history.  On examination, Dr. Eshkenazi noted that Ms. E. "sounded very anxious and tense, and it was clear that she has difficulty concentrating."  He reported that Ms. E. did not know the date, but she knew that President Obama was the sitting President.  He noted that Ms. E.'s speech was coherent; thought processes were responsive; memory was fair; affect labile; and her judgment and insight into her condition were "fair, at best."  Dr. Eshkenazi also noted that Ms. E. "easily became irritable and then depressed, and there were signs of some crying," but no evidence of psychosis during the evaluation.  He diagnosed Ms. E. with bipolar disorder and dysthymic disorder with generalized anxiety.  Dr. Eshkenazi opined that based on his review of the medical records and his evaluation, "from a psychiatric point of view, [Ms. E.] is not able to be gainfully employed" and he did "not anticipate improvement in her condition in the foreseeable future."  He did note that Ms. E. was able to manage her funds.[71]

On February 18, 2016, Ms. E. saw ANP Boga.  She reported having nightmares and being afraid to go to sleep.  ANP Boga observed that Ms. E. was very tearful and "sobbing throughout the entire interview."  She also noted that the effectiveness of Ms.

---

[71] A.R. 714–22.

E.'s medications was "marginal," but that Ms. E. reported taking her medications as prescribed. ANP Boga noted that she believed "that the stress and worry about her finances currently [was] a big problem for [Ms. E.]."[72] On the same date, ANP Boga completed a mental impairment questionnaire. ANP Boga noted that Ms. E. had memory problems, mood swings, sleep disturbances and nightmares, and problems with concentration, processing, and interaction. ANP Boga opined that Ms. E.'s ability to understand, remember, and carry out detailed instructions; sustain an ordinary routine without supervision; perform activities within a schedule and consistently be punctual; complete a workday without interruption from psychological symptoms; perform at a consistent pace without rest periods of unreasonable length or frequency; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; respond to workplace changes; be aware of hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; set realistic goals; and make plans independently were markedly impaired. ANP Boga opined that Ms. E. would be absent from work as a result of her mental impairments more than three times per month.[73]

On March 21, 2016, Ms. E. went to the emergency department at Fairbanks Memorial Hospital. She reported chronic foot pain. She also reported being a social drinker.[74]

---

[72] A.R. 1021–22.

[73] A.R. 709–13.

[74] A.R. 749.

On April 4, 2016, Ms. E. followed up with Jodi Oakland, SPT, at Fairbanks Memorial Hospital's Rehabilitation Department. She participated in physical therapy for foot and joint pain. PT Oakland observed that Ms. E. "seem[ed] to have difficulty with balance today, as she often is unable to stabilize and seems "clumsy." This may be due to her taking medication prior to session. [Ms. E.'s] pupils were significantly dilated compared to previous treatment sessions, and [Ms. E.] seemed more argumentative than usual and not as willing to complete PT exercises."[75]

On April 20, 2016, Ms. E. followed up with ANP Boga. Ms. E. reported sleeping well. On examination, ANP Boga noted that Ms. E.'s speech was "somewhat pressured though no more so than usual." She also noted that Ms. E. was "a little bit tearful during the interview, but she [was] not sobbing as she often does." ANP Boga noted that Ms. E. remained anxious, "but she [was] as stable . . . as I have ever seen her." She made no changes to Ms. E.'s medications.[76]

On April 29, 2016, Ms. E. visited Kimberly Sonderland, ANP, at ICHC. She reported back pain. On physical examination, Ms. E. was in no acute distress with "no depression, anxiety, or agitation" and displayed intact judgment and insight.[77]

On July 21, 2016, Ms. E. followed up with ANP Boga. She reported "falling a lot and bruising [herself]." ANP Boga noted that Ms. E. was "somewhat distressed and

---

[75] A.R. 895–99. Ms. E. initiated physical therapy on March 29, 2016. A.R. 900–04, 906–10. She cancelled physical therapy appointments on April 8, 2016, April 11, 2016, and April 21, 2016. A.R. 904.

[76] A.R. 1019–20.

[77] A.R. 802–804.

somewhat anxious, though these problems are in better control than they have been in the past." She also noted that anxiety when leaving home continued to be a problem for Ms. E. ANP Boga made no changes to Ms. E.'s psychiatric diagnoses.[78]

On August 4, 2016, Ms. E. went to the emergency department at Fairbanks Memorial Hospital. She reported nausea, dizziness, blurry vision, body aches, and lost consciousness after being hit by a car while riding her bike. On examination, Ms. E.'s mood and affect were quiet, drowsy, but responsive and appropriate, with intact judgment and insight.[79]

On August 16, 2016, Ms. E. saw June Morgan, ANP, at ICHC. She reported "running into things, distraction, short term memory" loss. She reported having a recent bicycle collision with a motor vehicle on August 3, 2016 and was referred to FBK Psych/Neuro for a neuro evaluation. She also reported drinking ½ of a pint of alcohol daily.[80] On physical examination, Ms. E. was in no acute distress with no depression, anxiety or agitation observed, and intact judgment and insight.[81]

On September 14, 2016, Ms. E. visited ANP Boga. ANP Boga noted that Ms. E. remained "very anxious with panic attacks and agoraphobia." ANP Boga made no changes to Ms. E.'s medications and noted that the neurologist would order labs.[82]

---

[78] A.R. 1017–18.

[79] A.R. 791–93.

[80] On September 29, 2016, Ms. E. saw Daniel Johnson, D.O., at McKinley Orthopedics & Sports Medicine, LLC. She reported that she was not using alcohol at that time. A.R. 834.

[81] A.R. 787–90.

[82] A.R. 1015–16.

On October 12, 2016, Ms. E. followed up with ANP Boga. She reported being worried about her health and her relationship with her daughter. On examination, ANP Boga observed that Ms. E. was "very distraught," "sobbing," "tangential, and somewhat disorganized" with her thoughts. ANP Boga noted that Ms. E. displayed high impulsiveness and her insight and judgment were "less than adequate." ANP Boga noted that while Ms. E. continued to take her medications as prescribed, their effectiveness was marginal. ANP Boga reported that Ms. E. requested no changes be made to her prescriptions.[83]

On December 14, 2016, Ms. E. saw ANP Boga. She reported having panic attacks. ANP Boga noted that Ms. E. "remains very distraught, though she is not crying today." ANP Boga also observed that Ms. E.'s "impulsivity is high" and her "insight and judgment are less than adequate." Ms. E. requested no changes be made to her medications. ANP Boga opined that the medications were marginally effective.[84]

On February 15, 2017, Ms. E. went to the emergency department at Fairbanks Memorial Hospital. She reported right lower jaw pain secondary to poor dentition. On physical examination, the attending doctor observed that Ms. E. was "awake, alert, in no acute distress."[85]

---

[83] A.R. 1013–14.

[84] A.R. 1011–12.

[85] A.R. 918–20. Ms. E. went to the emergency department at Fairbanks Memorial Hospital on May 14, 2017 for chronic back pain. On physical examination, Ms. E. was awake and alert, but "uncomfortable, sedated seeming/tired." A.R. 914–15.

On February 22, 2017, Ms. E. visited ANP Boga. On examination, ANP Boga observed that Ms. E.'s judgment and insight were adequate and she was organized and oriented x 4. ANP Boga reported that Ms. E.'s mental status was improving. Ms. E. denied the use of alcohol or street drugs. ANP Boga again noted that Ms. E. wanted no changes to her prescriptions.[86]

On April 12, 2017, Ms. E. followed up with ANP Boga. She reported her mood had improved, she was crying less, had more energy, and was sleeping better. She reported continuing to have flashbacks and nightmares and continuing to "experience difficulty being in a closed place for a specific length of time." ANP Boga noted that Ms. E. was "as stable psychiatrically at this point than I have seen her." ANP Boga continued Ms. E.'s prescriptions.[87]

On June 15, 2017, Ms. E. followed up with ANP Boga. She reported feeling hopeless and helpless due to situational problems and that she continued to have flashbacks and nightmares, but she denied thoughts of self-harm. ANP Boga noted that Ms. E. was "very labile today and very distressed." She made no change to Ms. E.'s medications.[88]

---

[86] A.R. 1009–10.

[87] A.R. 1006–08.

[88] A.R. 1003–05.

On July 1, 2017, Ms. E. went to the emergency department at Fairbanks Memorial Hospital. She reported "falling asleep all the time" and neck pain. She tested positive for methamphetamines.[89]

*Function Reports*

On February 25, 2013, Ms. E. completed a function report. She reported living in a motel. She reported having no problems performing her personal care and that she spent her day exercising, watching television, and reading. She also reported being able to prepare food and clean her room. Ms. E. indicated that she was able to go outside, rock climb, swim, bike ride, walk, use public transportation, shop in stores, and ride in a car. She reported getting "so depressed sometimes that I will drink to get some relief then I don't stop drinking [until] all the money's gone." She indicated that she did not like being around people and that depression and panic attacks made it difficult for her to "go out." Ms. E. also indicated that her conditions affected her memory, concentration, and ability to complete tasks, follow instructions, and get along with others.[90]

On February 28, 2013, Chelsie E., Ms. E.'s daughter, completed a function report on her mother's behalf. She indicated that she spent "a couple hours a month" with her mother and that they ate and visited and watched television. Chelsie E. reported that Ms. E. "hangs out at home"; had no problems with personal care; could do laundry and cleaning; and could walk, rock climb, use public transportation, ride in a car, and ride a

---

[89] A.R. 949–55.

[90] A.R. 441–48.

bicycle.  She indicated that Ms. E.'s conditions affected her concentration and her ability to complete tasks and get along with others.[91]

*Hearing Testimony on August 16, 2017*

On August 16, 2017, Ms. E. testified by video from Fairbanks with representation. She testified that she did painting and cleaning for her landlord and that she was able to set her own schedule "because he lets me work when I want to because sometimes I can't go out of the house or if I feel like I'm on a time clock, I panic because . . . when I clock in [I feel] that I'm trapped."  She testified that she felt she could not leave her house two or three days per week or about nine days per month.   Ms. E. testified that her medications helped with her mood fluctuations, but that they were "getting less and less helpful."  She indicated that she was living alone at the time of hearing and did her own shopping, but usually went to the food bank because she didn't like going to the store. She testified that sometimes she "tore up" her apartment, but then she would "fix it up." Ms. E. also testified that she was physically able to do her laundry and perform personal care, but she would do her laundry in the bathtub so she wouldn't "have to go out" and was "scared when [she] took a shower" so she took only quick showers.  She reported that she liked to draw, but she didn't read "because I can't remember the first page."[92]

Colette Valette, Ph.D., testified as the psychological expert.  Based on her review of the record, Dr. Valette opined that Ms. E.'s severe mental impairments included alcohol dependence in early remission; methamphetamine abuse; alcoholism; poly substance

---

[91] A.R. 449–56.

[92] A.R. 70–81.

dependence; cocaine dependence reportedly in remission; depressive disorder atypical; dysthymic disorder; bipolar disorder not otherwise specified; generalized anxiety disorder; post-traumatic stress disorder; and insomnia. Dr. Valette opined that Ms. E. did not meet or equal any of the listings for mental health impairments and noted that Ms. E. reported paying bills, using public transportation, and shopping in stores. Dr. Valette also noted that "no problems were reported in any of the exhibits interacting with professional doctors [and Ms. E.] sat in the waiting room." She also noted that when Ms. E. "went to doctors for physical ailments, there were no problems noted with her being distracted, having attention problems, needing directions repeated." Dr. Valette testified that she disagreed with Dr. Wendt's conclusions and recommendations. She testified that Dr. Wendt reported in her evaluation that Ms. E.'s mental status was normal, her thought content was adequate, she could complete her ADLs, she was cooperative, and her memory was fine. Dr. Valette noted that the only difficulty Dr. Wendt noted objectively during the evaluation was that Ms. E. could not do serial sevens. Dr. Valette opined that a failure to do serial sevens "doesn't mean that the person has attention difficulties" and that "Dr. Wendt [was] basing limitations on subjective complaints of [Ms. E.]." Dr. Valette concluded that Ms. E. had no mental health limitations "because it's difficult to come up with a significant or clear diagnosis when substance abuse is involved throughout the entire record" and that "the objective evidence show[ed] that [Ms. E. was] functioning well" despite her mental health diagnoses.[93]

[93] A.R. 43–63.

William Weis testified as the vocational expert. Based on ALJ Hebda's hypothetical,[94] VE Weis opined that an individual of Ms. E.'s age, education, and past work experience could perform work as a janitor, cleaner II, or laundry worker.[95]

## IV. DISCUSSION

Ms. E. is represented by counsel in this appeal. In her opening brief, she asserts that the ALJ "failed to fully and fairly develop the record with respect to consultative examining psychologist Nina Wendt, Ph.D., as required by regulations, and as specifically mandated by the Appeals Council when it vacated and remanded the 2015 Unfavorable Decision."[96] The Commissioner contests Ms. E.'s assertions.[97]

A. <u>The ALJ Failed to Comply with 20 C.F.R. § 416.917</u>

Ms. E. asserts that the ALJ failed to comply with the Appeals Council remand instructions regarding Dr. Wendt's consultative examining report. Specifically, Ms. E. alleges that "the commissioner did not comply with regulations to prepare Dr. Wendt, then the agency discounted Dr. Wendt's opinion because of the agency's own failing in

---

[94] The ALJ's hypothetical was as follows:

> I have an individual of the claimant's age, education and past work experience who would be able to perform medium level work as defined by the Social Security Administration and with that, we would prohibit the climbing of ladders, ropes and scaffolding; and we would have the avoidance of all exposure to unprotected heights and hazardous machinery. A.R. 82.

[95] A.R. 82–83.

[96] Docket 15 at 1, 9–20.

[97] Docket 17 at 4–20.

preparing her as it should have done."[98]  The Commissioner makes several arguments,

including:  (1) the Court has no jurisdiction to review the ALJ's compliance with the

Appeals Council's 2016 remand order, and (2) 20 C.F.R. § 416.917 does not require the

Commissioner "to send a consultative examiner *all of the available medical records* much

less *any medical records*."[99]  As set forth below, the Court concludes that the ALJ erred

by failing to provide Dr. Wendt with Ms. E.'s mental health records in violation of 20 C.F.R.

§ 416.917.  The Court reverses the ALJ's decision based on that error.

1.  *This Court Lacks Jurisdiction to Review the Appeals Council's 2016 Remand Order*

In the discussion of her argument, Ms. E. asserts that the ALJ failed to comply with

the Appeals Council's instructions on remand.[100]  The Ninth Circuit has held that a court

does not have jurisdiction to review a decision of the Appeals Council denying a request

for review of an ALJ's decision, because the Appeals Council decision is a non-final

agency action.[101]  When the Appeals Council declines review, "the ALJ's decision

becomes the final decision of the Commissioner," and this Court reviews that decision for

substantial evidence, based on the record as a whole.[102]  In this case, the Commissioner

argues that "whether the ALJ's decision in 2017 complied with Appeals Council's 2016

---

[98] Docket 15 at 9–11.

[99] Docket 17 at 5–12.

[100] Docket 15 at 9.

[101] 42 U.S.C. § 405(g); *see also Brewes v. Comm'r of Social Sec. Admin.,* 682 F.3d 1157, 1161–62 (9th Cir. 2012); *see also Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).

[102] *Id.* at 1162; *see also Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

remand order is an issue solely within the purview of the Appeals Council's 2018 consideration of that decision."[103]  The Court agrees.[104]  This Court declines to evaluate whether the ALJ's second decision complied with the remand order of the Appeals Council.

> ### 2.    *The ALJ Failed to Comply with 20 C.F.R. § 416.917*

Although this Court declines to review the ALJ's compliance with the remand order, we "independently determine whether the Commissioner's decision (1) is free of legal error and (2) is supported by substantial evidence."[105]  In his second decision, the ALJ gave Dr. Wendt's opinion "limited weight" for the "reasons that Dr. Valette expressed, including normal mental status testing and a heavy reliance on [Ms. E.'s] self-reported symptoms."[106]  Dr. Wendt evaluated Ms. E. on March 23, 2015.[107]  She diagnosed Ms. E. with posttraumatic stress disorder (PTSD) and "Bipolar I Disorder, Current episode depressed, Rule Out."  Based on a mental status examination, Dr. Wendt opined that Ms.

---

[103] Docket 17 at 6–7.

[104] The Commissioner cites to unpublished opinions noting that in the Ninth Circuit and among district courts in the Ninth Circuit, the courts have rejected "failure to follow remand orders" arguments.  *See, e.g., Tyler v. Astrue,* 305 F. App'x 331, 332 (9th Cir. 2008) (unpublished) ("The district court properly declined to evaluate whether the ALJ's second decision satisfied the demands of the Appeal Council's remand."); *Webber v. Berryhill,* 2017 WL 722593, at *3 (E.D. Wash. Feb. 23, 2017); *Nickolite v. Colvin,* 2015 WL 1467201, at *2 (D. Or. March 30, 2015); *Lara v. Colvin,* 2013 WL 5520220, at *2 (C.D. Cal. Oct. 3, 2013).  Unpublished dispositions and orders of the Ninth Circuit Court issued on or after January 1, 2007 may be cited by the courts of the Ninth Circuit.  U.S.Ct. of App., 9th Cir. Rule 36-3.

[105] *Brewes,* 682 F.3d at 1161; *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996).

[106] A.R. 25.

[107] A.R. 684–88.  The ALJ issued his first decision on March 19, 2015 and did not address Dr. Wendt's opinion in that decision.  A.R. 139–50.

E. was "a chronically homeless and mentally ill woman who has not previously had the emotional and physical resources to adequately access services. She is unable to reason or make occupational, personal, or social adjustments. She is unable to handle her own finances and lives most of her life isolated from other people." Dr. Wendt noted that she lacked documents regarding Ms. E.'s past mental health hospitalizations for suicide attempts in 2004 and 2012 and also lacked documents regarding Ms. E.'s "current mental health treatment." Dr. Wendt also noted that "[v]iewing some of these documents would have aided in being able to give her a more accurate diagnosis."[108]

As Ms. E. points out in her brief, the medical records that were not provided to Dr. Wendt should have been in the ALJ's record as of the January 2015 hearing.[109] The Commissioner does not dispute Ms. E.'s assertion that the ALJ did not provide medical records to Dr. Wendt, but instead asserts that the agency was not required to provide any documents and any failure to provide Dr. Wendt with medical records would be a harmless "procedural error."[110]

A federal agency is obligated to adhere to the regulations it promulgates.[111] Pursuant to 20 C.F.R. § 416.917, the agency must provide consultative examiners with

---

[108] A.R. 684–88.

[109] Docket 15 at 13–14. In the record of the hearing transcript from January 12, 2015, Ms. E.'s attorney confirmed that the ALJ had received records through September 18, 2014. A.R. 92–93.

[110] Docket 17 at 11.

[111] *Sameena, Inc. v. U.S. Air Force,* 147 F.3d 1148, 1153 (9th Cir. 1998) (citing *Vitarelli v. Seaton,* 359 U.S. 535, 545 (1959)).

"any necessary background information" concerning a claimant's condition.[112] And, "necessary background information" has been interpreted by other courts to mean medical records.[113] Additionally, Ms. E. points out that pursuant to 20 C.F.R. § 416.919p, if a consultative report "is inadequate or incomplete, [the ALJ] will contact the medical source who performed the consultative examination, give an explanation of [his] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report."[114] Here, the ALJ discounted Dr. Wendt's opinion for relying heavily on Ms. E.'s self-reports, yet Dr. Wendt's examination report expressly lamented the lack of documentation regarding Ms. E.'s past hospitalizations for suicide attempts as well as records documenting Ms. E.'s mental health at the time of the evaluation.[115]

The Ninth Circuit has held that an agency abuses its discretion when it fails to abide by its own regulations and that it is all the more important when "Congress has explicitly directed that the agency's procedures for assessing the work produced by consultative examiners be prescribed by regulation."[116] In this case, the ALJ ordered a

---

[112] 20 C.F.R. §§ 416.917, 404.1517.

[113] *Peacock v. Comm'r of Soc. Sec. Admin.,* 2018 WL 2753151, at *6 (D. Ariz. June 6, 2018); *Brantley v. Comm'r of Soc. Sec.,* 637 Fed. Appx. 888, 894–95 (6th Cir. 2016) (The Social Security Administration's Program Operations Manual System (POMS) "specifically instructs SSA employees to provide consultative examiners with 'duplicates or summaries of relevant evidence such as . . . [m]edical evidence of record including any medical opinions.'"); *see also Wilson v. Comm'r of Soc. Sec.,* 378 F. 3d 541, 546 (6th Cir. 2004) ("to recognize substantial evidence as a defense to non-compliance with [the regulation at issue] would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.").

[114] Docket 15 at 17 (citing 20 C.F.R. § 416.919p(b)).

[115] A.R. 25, 684–87.

[116] *Reed v. Massanari,* 270 F.3d 838, 843 (9th Cir. 2001) (citing *Andriasian v. I.N.S.,* 180 F.3d

consultative exam, apparently did not provide medical records that Dr. Wendt, as an expert, considered critical, and then discounted Dr. Wendt's opinions based in part on her lack of objective findings.[117]   Dr. Wendt, therefore, based her assessment on an incomplete picture of Ms. E.'s condition.  While the Court cannot determine whether the medical records that Dr. Wendt lacked would have influenced her opinion, the ALJ's reason for discounting Dr. Wendt's opinion was in part the result of his failure to provide Dr. Wendt with "necessary background information."[118]   Therefore, the Court cannot conclude that the ALJ's reasoning was supported by substantial evidence and reverses based on this error.

B.   Scope of Remand

The "ordinary remand rule" applies to disability cases.  Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[119]  Here, the Court has found that, in light of the record as a whole, the ALJ's decision was not supported by substantial evidence or free of legal error regarding Dr. Wendt's consultative examination.

---

1033, 1046 (9th Cir. 1999)).

[117] A.R. 23–25, 116, 143–50, 679–88.

[118] *See Peacock,* 2018 WL 2753151, at *5 (specifically concluding that "the ALJ violated § 416.917 by failing to provide Dr. Cunningham with Plaintiff's 'necessary background information,' specifically his medical records."); *Deden v. Colvin,* 2013 WL 6189954, at *5 (C.D. Cal. Nov. 26, 2013) (noting that "background information is essential, because consultative exams are utilized 'to try to resolve a conflict or ambiguity if one exists'").

[119] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

Specifically, the agency did not provide Dr. Wendt with "necessary background information" in violation of 20 C.F.R. § 416.917.

Ms. E. argues that this matter should be remanded for a *de novo* hearing and a new decision.[120]  The Commissioner responds that the Court should affirm, or in the alternative, the Court should remand for further administrative proceedings.[121]  Therefore, the case will be remanded for the ALJ to order a new consultative examination providing "all necessary background information," including all of Ms. E.'s mental health medical records in the agency's record.  Additionally, the ALJ should hold hearings and take new testimony regarding Ms. E.'s mental health impairments, adjust the RFC as warranted, and proceed to steps four or five as appropriate.

## V.  ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error.  Accordingly, IT IS ORDERED that Ms. E.'s request for relief at Docket 15 is GRANTED, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 22nd day of November, 2019 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[120] Docket 15 at 21.

[121] Docket 17 at 19–20.